775 A.2d 637 (2001)
341 N.J. Super. 548
Karyn L. NUFRIO, Plaintiff-Respondent,
v.
Marc E. NUFRIO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 3, 2001.[1]
Decided June 29, 2001.
*638 Teresa A. Tosi argued the cause for appellant.
William A. Colavito, Belleville, argued the cause for respondent.
Before Judges STERN, A.A. RODRÍGUEZ and FALL.
The opinion of the court was delivered by FALL, J.A.D.
In this matrimonial appeal we consider the appropriateness of establishing a joint legal custodial relationship between parents as to their minor child, irrespective of the parenting time-sharing arrangement. We hold that the allocation of the amount of time each parent spends with the child is not the sole basis for determining whether the parties should share "joint legal custody" of their child. Moreover, we conclude that the prime criteria for establishing a joint legal custodial relationship between divorced or separated parents centers on the ability of those parents to agree, communicate and cooperate in matters relating to the health, safety and welfare of the child notwithstanding animosity or acrimony they may harbor towards each other. The ability of parents to put aside their personal differences and work together for the best interests of their child is the true measure of a healthy parent-child relationship. A judicial custody determination must foster, not hamper, such a healthy relationship. Therefore, a parent's amenability or inability to cooperate with the other parent are factors to be considered in awarding joint legal custody.
Defendant, Marc. E. Nufrio, appeals from the custodial and other provisions contained in the final judgment of divorce entered on November 29, 1999, after a trial. The relevant marital and procedural history is, as follows. The parties were married on December 7, 1991. One child was born of the marriage, Ryan, on May 25, 1995. The parties separated on August 27, 1996, and each party filed a complaint for divorce on or about November 1, 1996. The complaints were consolidated by an order entered on November 22, 1996.
The contested issues in the case focused on the parties' dispute concerning the issue of joint legal custody. Our Supreme Court clarified the definitions of "joint physical custody" and "joint legal custody" in Pascale v. Pascale, 140 N.J. 583, 595-97, 660 A.2d 485 (1995). The Court reaffirmed the principle that "`[p]roperly analyzed, joint custody is comprised of two elements-legal custody and physical custody[.]'" Id. at 595-96, 660 A.2d 485 (quoting Beck v. Beck, 86 N.J. 480, 486, 432 A.2d 63 (1981)). In discussing the concept of joint physical custody, the Court explained:
"[J]oint physical custody" means "joint responsib[ility] for `minor' day-to-day decisions" and the exertion of continuous physical custody by both parents over a child for significant periods of time. Although there is no established norm for such custody, experts cite common schedules for a child within a joint physical custody framework as spending three entire days with one parent and four entire days with another parent or alternating weeks or even years with each parent. Thus, the import from the voluminous literature on the subject is that "joint physical custody" means that the child lives day in and day out with both parents on a rotating basis. Numerous "parenting times" with a child do not constitute joint physical custody;

*639 to constitute joint custody, each parent must exert joint legal and joint physical custody over the child.
A review of New Jersey cases leads us to believe that "joint physical custody" is as rare here as it is in other states.
[Pascale, supra, 140 N.J. at 596-97, 660 A.2d 485 (quoting Beck, supra, 86 N.J. at 487, 432 A.2d 63 (1981); other citations omitted).]
In discussing joint legal custody, the Court stated:
Joint legal custody, meaning the "authority and responsibility for making `major' decisions regarding the child's welfare," is often shared post-divorce by both parties. Joint legal custody provides rights and responsibilities to custodial parents, but it also confers rights with less significant responsibilities to non-custodial parents. Indeed, that type of joint venture is found in the majority of custody arrangements throughout the country today.
....
In New Jersey, joint legal custody with physical custody to only one parent is much more common [than joint physical custody]. Time spent with the non-custodial parent may vary widely. In a recent case, the Appellate Division defined "liberal visitation" to the non-custodial parent as consisting of alternate weekends, one night per week, and alternate major holidays, including holidays like Labor Day and extended school holidays. McCown v. McCown, 277 N.J.Super. 213, 214, 649 A.2d 418 (App.Div.1994). We find that type of schedule for "parenting time" is common in cases of joint legal custody with only one parent having physical custody. Thus, the continuum in this State for the "parenting time" of non-custodial parents is wide and the cases of "joint physical custody" are rare.
[Id. at 596, 597, 660 A.2d 485 (quoting Beck, supra, 86 N.J. at 487, 432 A.2d 63; other citations omitted).]
The Court also adopted the concept of the "primary caretaker" in joint legal custodial relationships, stating:
In cases of only joint legal custody, the roles that both parents play in their children's lives differ depending on their custodial functions. In common parlance, a parent who does not have physical custody over [his or] her child is the "non-custodial parent" and the one with sole residential or physical custody is the "custodial parent." Because those terms fail to describe custodial functions accurately, we adopt today the term "primary caretaker" to refer to the "custodial parent" and the term "secondary caretaker" to refer to the "non-custodial parent."
Although both roles create responsibility over children of divorce, the primary caretaker has the greater physical and emotional role. Because the role of "primary caretaker" can be filled by men or women, the concept has gained widespread acceptance in custody determinations.

[Id. at 597-98, 660 A.2d 485.]
Here, a pendente lite order was entered on December 19, 1996, providing for joint legal custody of Ryan by the parties, with plaintiff, Karyn L. Nufrio, designated as the primary residential custodian. The order required Dr. Mathias R. Hagovsky, a psychologist, "to provide the parties with therapeutic mediation including, but not limited to, determination of visitation on holidays and where pickup and exchange of the minor child between the parents will take place, as well as other pertinent issues arising in this case." Defendant was ordered to pay $150 per week to plaintiff, *640 allocated as $100 in child support and $50 for child-care costs.
Thereafter ensued a bitter and acrimonious pendente lite history, marred by frequent applications to the court and several municipal court and domestic violence charges. During that period, numerous additional orders were entered concerning the issues of custody and parenting time, and Dr. Deborah Fisch, a psychologist, was appointed by the court to conduct a custody and parenting-time evaluation.
The matter was tried before Judge Zampino on consecutive trial days between September 30, 1999 and October 14, 1999, primarily on the issues of custody and parenting-time. In addition to the parties, 19 other witnesses testified, including several of the parties' relatives, friends, co-workers, neighbors, and caretakers and teachers of the child. Additionally, Dr. Fisch testified.
On October 19, 1999, Judge Zampino issued a comprehensive written decision, augmented by an oral decision delivered to the parties in open court. The judge made specific findings of credibility, fact, and entered conclusions of law in rendering his decision. In his written decision, the judge stated, in part:
Marc Nufrio does nothing that is not for his own benefit, he cannot perceive how difficult he makes things for other people and does not believe that he has done wrong, in anything. He is one who believes his own lies.....
He is pathological in his testimony and he is totally unbelievable. His videotaping at the police station exchanges, his complaints to the State about day care and his multiple filings of litigation all appear to be an attempt to assert his dominance over his former wife.
....
The Court will grant sole custody to Karen Nufrio. The Court will repeat that Karen Nufrio will solely make any decisions for school enrollment and aftercare facility.
....
Mr. Nufrio never once spoke to his wife during the trial and sees, by his own admission, no need or benefit to change.
....
The Court had to admonish the husband for laughing and smiling when the wife was testifying in Court. For whatever unexplained reason, the husband appears unable to cooperate or communicate with the child's mother.
The Court feels that the child's rights will not be protected if joint custody is awarded and continuing conflict between the parties will increase if called upon to make "together" decisions. The history of motion litigation in this case highlights over a three year period, each inability to reach even basic agreements. Mrs. Nufrio can no longer be challenged by Mr. Nufrio in every thing that she does for their son on all issues concerning the child.
Of greater interest to this was that upon the Court's questioning, the father testified that he believed that his wife has psychological problems and that he couldn't trust her and he did not believe that she was looking at the child's best interest. He exhibited a voicing of the same fears and apprehension that he portrayed to Dr. Fisch in her report. Dr. Fisch testified that none of this had any validity.
The final judgment of divorce executed on November 29, 1999, vests sole custody of Ryan with plaintiff and provides defendant with an extensive parenting-time schedule. Consistent with the judge's findings, the judgment also restrains and restricts defendant's conduct by prohibiting *641 defendant from telephoning plaintiff at her place of employment, limiting his telephone calls to her home, precluding each party from video-taping and audio-taping the other, and requiring that all future municipal court complaints, with the exception of domestic violence complaints, "be funneled through the Superior Court" prior to filing. Defendant was also ordered to attend "counseling sessions on a regular basis, which shall be two times a month, for the purpose of understanding the relationship necessary between two parents raising a child after a divorce[.]"
The judgment also continued the $150 per week child support order; required defendant to pay to plaintiff $500 each year to equalize the cost of medical insurance coverage which plaintiff provides for the child through her employment; required defendant to pay plaintiff $500 each year for Ryan's clothing expenses; dismissed, with prejudice, all pending municipal court complaints against plaintiff, brought by defendant; ordered defendant to pay plaintiff $17,000 on or before November 30, 1999, representing half of a $34,000 check received by defendant as a result of cashing-in whole life insurance policies during the parties' separation; required plaintiff to maintain a policy of insurance on his life, naming the child as beneficiary, with plaintiff as trustee, in the amount of $200,000; and awarded plaintiff a counsel fee in the amount of $10,000, payable by defendant on or before January 31, 2000.
On appeal, defendant presents the following arguments for our consideration:
POINT I
A JUDICIAL HEARING, WHICH COMPORTS WITH DUE PROCESS[,] REQUIRES A NOTICE DEFINING THE ISSUES, AFFORDING AN ADEQUATE OPPORTUNITY TO PREPARE AND RESPOND BEFORE THE PROCEEDINGS ARE CLOSED.
POINT II
BECAUSE OF THE ABSOLUTE NATURE OF SOLE CUSTODY DETERMINATIONS, IN WHICH ONE PARENT "WINS" AND THE OTHER "LOSES," THE CHILDREN ARE LIKELY TO BECOME THE SUBJECT OF BITTER CUSTODY CONTESTS AND POST-DECREE TENSION AND JOINT CUSTODY IS LIKELY TO FOSTER THE BEST INTERESTS OF THE CHILD.
POINT III
THE DUAL JUDGMENT OF DIVORCE CLEARLY DOES NOT ENCOMPASS THE FINDINGS OF THE TRIAL COURT.
Our careful review of the record in the light of the written and oral arguments of the parties discloses that these arguments are clearly without merit and do not warrant extensive discussion in this opinion. R. 2:11-3(e)(1)(A) and (E). The trial judge's findings are supported by sufficient credible evidence in the record, see Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974), and his conclusions and the rulings articulated in his comprehensive letter opinion dated October 19, 1999 and his oral opinion delivered on that same date are reasonable and proper methods of seeking to achieve the best interests of the children. The judge properly considered and made findings with respect to the various factors enumerated in N.J.S.A. 9:2-4(c).
"Under a joint custody arrangement legal custodythe legal authority and responsibility for making `major' decisions regarding the child's welfareis shared at all times by both parents." Beck, supra, 86 N.J. at 486-87, 432 A.2d 63. Although a joint legal custodial relationship among parents is the preferred arrangement since it "is likely to foster the best interests of the child in the proper *642 case," id. at 488, 432 A.2d 63, "the decision concerning the type of custody arrangement [is left] to the sound discretion of the trial court[.]" Pascale, supra, 140 N.J. at 611, 660 A.2d 485.
Although the judge has provided defendant with significant parenting time with his son, the findings of the judge make it clear that any form of "joint" custody or shared decision-making will be detrimental to the parties' child. The concern that the defendant would use the label of "joint legal custody" as a disguised attempt to harass plaintiff through repeated applications to the court has support in the record. Such a situation would clearly be detrimental to the best interests of the child. We also note that the judgment of divorce does state that defendant may "make an application for joint legal custody after the child completes second grade at which time the Court will review the parties' ability to communicate and cooperate during the prior time period." Hopefully, the counseling put in place by the court in the judgment can lead to a basis for appropriate communication and cooperation between the parties.
As we have noted, the primary focus of the divorce trial was the issue of joint legal custody. However, a careful review of the record discloses significant testimony concerning the financial circumstances of the parties, including the issues of support, medical coverage for the child, and life insurance. Throughout the course of this elongated trial each party was afforded adequate opportunity to present testimony on a wide array of marital issues. There is substantial credible evidence contained in the record that supports each provision contained in the judgment of divorce.
Affirmed.
NOTES
[1] The appeal was argued telephonically.